```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x
THEODORE BOHN,
                Plaintiff           Docket #:  1:24cv09283 (PAE)(GS)

     -vs-
                                    FIRST AMENDED COMPLAINT

THE CITY OF NEW YORK, JOHN DOE 1-50,
JANE DOE 1-10, A, B, and C,
                Defendants.
----------------------------------x
```

Plaintiff, as and for his Complaint, says:

1. Plaintiff is a Gay man and civil rights attorney who has been practicing for almost thirty-eight years.  Plaintiff is a veteran of the early Gay Rights Movement in NYC and was an AIDS activist throughout the worst of the AIDS epidemic.

2. Defendant City of New York is a municipal corporation encompassing the Fire Department of New York (FDNY) and New York Police Department (NYPD).

3. Upon information and belief, defendants JOHN DOES 1 - 50 are members of the FDNY or NYPD.

4. Upon information and belief, Defendants JANE DOES 1 – 10 are members of the FDNY or NYPD.

5. Defendants A, B and C are juridical/corporate entities which may have had involvement in the complained of activity, but whose identities are presently unknown to plaintiff.

6. The Complaint will necessarily have to undergo successive amendment(s) as to factual allegations, parties-defendant, and causes of action as discovery progresses.[1]

---

[1] Significant progress can be made through the service of several well-placed subpoenas, for example, on Robert Perez, on Timothy Fenfert, on John Finn himself, among others.

JURISDICTION AND VENUE

7. The Court has jurisdiction pursuant to 28 U.S.C. Section 1331 inasmuch as the claims asserted arise under the Constitution and laws of the United States.

8. Venue is proper in that the events complained of occurred within the City of New York including New York and Kings Counties.[2]

PRELIMINARY STATEMENT/HISTORY

9. This case is brought to address the continuous, uninterrupted unlawful surveillance of plaintiff by defendants as part of a much broader criminal enterprise which has victimized plaintiff since the 1990's in retaliation for a case which plaintiff brought (in a representative capacity) against a member of the FDNY who was an accomplice in an assault on two AIDS educators in Queens, NY (Cavallo/Stapen v. Finn, Supreme Court, Queens Co).[3],[4], [5] Sandra Stapen (late), one of the two AIDS educators, asked Finn whether he might want AIDS literature or condoms which were displayed on a card table.

---

[2] To the extent that the Amended Complaint makes reference to events which occurred in other Districts, it is possible that those events will give rise to Multi-District Litigation.  Further, it is an express allegation of the Amended Complaint that such events are properly included as part of the factual predicate in the instant case, as long as they are connected to the enterprise itself.

Plaintiff uses the word "enterprise" to describe the activity at issue and its principals.  But for RICO's proscription on single-victim plaintiffs, the activities complained of would be stated as RICO violations.

[3] Upon information and belief, Finn's accomplice, a foreign national, fled the U.S. to avoid prosecution.

[4] The enterprise is comprised of street gangs and pedophiles at one end, acting in concert with firemen, police, EMT's and members of the Irish mafia at the other.  Not infrequently, they overlap.

[5] At the start of the activities which form the basis of this Complaint, Plaintiff resided in Manhattan, and had his law office in Manhattan.

Finn stated "Only scum need condoms"[6] and flipped over the card table. Finn and his accomplice then left and returned in a vehicle.  Finn was alleged to have brandished a firearm and to have falsely claimed to have been a police officer so that the victims would not fight back while his accomplice assaulted Ms. Stapen and Mr. Cavallo.

    10.    Fortunately, a witness wrote down the license plate number of the vehicle involved. Finn was arrested shortly thereafter.

    11.    Finn pled guilty to misdemeanor charges; upon information and belief, as part of the plea agreement, a felony charge was dismissed which allowed Finn to keep his position with the FDNY, and to not jeopardize his pension.[7]

    12.    Upon information and belief, Finn has been arrested on several other occasions.  In fact, he was arrested during the pendency of Cavallo/Stapen v. Finn on charges that he sexually molested his minor daughter.

    13.    The undersigned prevailed on summary judgment in the civil action based on Finn's allocution and plea in the criminal case.

    14.    Prior to trial on the issue of damages, Finn telephoned the undersigned and stated "You might want to think a little more carefully before proceeding with the trial" or words to that effect.

    15.    Finn attended the first scheduled call of the trial calendar where he approached plaintiff, then turned and nodded to an individual with whom he had been seated in the gallery.  When pressed, Finn stated he said was a "friend."  The case was adjourned.

    16.    Finn defaulted at the hearing on damages.

---

[6] This statement will figure into another reprehensible act in which the enterprise engaged (see Paragraph 29).

[7] This case serves as a cautionary tale to prosecutors who are inclined to leniency.

17. Judgment was subsequently entered after inquest.

18. During collection proceedings, plaintiff could barely walk a city block safely. Gang members would appear and be waiting at the next avenue. Travel by most forms of public transportation soon became a thing of the past; it has remained so ever since.

19. Strange things soon began to happen after <u>Stapen/Cavallo v. Finn</u> was commenced.

20. One of the earliest manifestations of the enterprise enlisted one Steven Mallory, an anti-gay thug, to pose as a new client in plaintiff's Manhattan office.

21. During the "consultation," Mallory repeatedly reached into a paper bag at his feet and then rapidly stood up. His behavior was so bizarre and alarming that he was ultimately escorted out.

22. Some time thereafter, Plaintiff learned that Mallory had been arrested by the FBI for beating several Gay men half to death.

23. The FBI indicated that Mallory's *modus operandi* had never included going to anyone's office or posing as a client; they were curious why he had done so in this case. Fortunately, Plaintiff had physical evidence to prove his contentions, and at sentencing, Mallory did not deny that he had passed a bad check to Plaintiff.

24. Mallory's purpose in plaintiff's NY office that day was obviously a dry-run intended to culminate in a far more serious outcome. And he had clearly been put up to it by someone. Mallory had claimed to have been referred to Plaintiff by an AIDS-service organization.

25. From cut phone lines to slashed tires; hundreds of pieces of stolen, opened or vandalized mail; the disruption of

judicial proceedings by the activation of fire alarms during oral argument; the disruption of depositions by the same means; repeated burglaries of plaintiff's home/office (despite that both have been alarmed at all times material hereto); the theft of voluminous evidence documenting the complained of activity, more than a dozen false police stops; hundreds of false or pretextual fire/police/ambulance "emergencies" by which law enforcement vehicles pursue plaintiff (sometimes shutting off their lights and sirens once they pull up alongside or overtake plaintiff); many dozens of cybercrimes; relentless stalking including by the use of vehicles with decommissioned plates; relentless stalking by uniformed personnel into establishments which plaintiff has gone – and far more, the incidents at issue in the criminal enterprise are without precedent.

26. During this time, plaintiff's gym locker was broken into within minutes after Plaintiff's arrival. It was a lock which could only have been removed with a heavy-duty lock cutter.

27. On another occasion, a waiter literally tossed silverware on the table where plaintiff had just been seated at a restaurant on the Upper West Side. When plaintiff objected, the manager accused plaintiff of having taken the waiter's tip off the table. Plaintiff denied any such conduct. The Manager responded "A fireman saw you do it."

28. Plaintiff's father received a summons from the City of Utica, NY – a place he had never been. When Plaintiff pressed the issue with Counsel for the City, no one in the Utica Police Department could locate the original summons. A Notice of Claim was filed; the summons was withdrawn.

29. Plaintiff's mother was shopping one evening – a woman then in her mid-60's. The cart was nearly empty and when Plaintiff's mother returned to her cart, she found that a box of condoms had been

placed in it.[8]  Plaintiff's mother identified the lone male individual who had been in the aisle to the store manager.

30.   NYPD officers began ticketing Plaintiff's vehicle – sometimes twice in a half hour for the same offense (no front plate) – and issuing false summonses.  On one such occasion, following a physician's appointment, plaintiff returned to his vehicle with approximately four minutes of time left on the meter to find two NYPD vans idling alongside poised to issue a citation.  Plaintiff videotaped those officers as they tried to avoid the camera.[9]

31.   The representative examples which follow are just that: representative.  By 2002, Plaintiff had to move out of NYC to the home of friends in NJ; thus the incidents which are listed are those occasions when Plaintiff was in NYC.  From 2004-2012 Plaintiff resided in Suffolk County where one ROBERT PEREZ stalked plaintiff incessantly as did several firemen.[10]

32.   The stalking by firemen in NJ began soon after plaintiff relocated to NJ.  And several individuals who had stalked

---

[8] Cf. allegations at Paragraph 8, *supra*.

[9] Police officers who are stationed legitimately do not need to avoid a camera or attempt to flee before they are recorded.  Suspects do that.

[10] One fireman in Suffolk County, who stalked plaintiff relentlessly, used flashing lights to effectuate a traffic stop after plaintiff documented his stalking activity on video.  On another occasion, when the same individual again stalked Plaintiff, that individual drove up to where Plaintiff was standing and demanded that Plaintiff hand over the footage.  Upon information and belief, that individual is now an NYPD Detective.  A subpoena to that individual will help significantly in solidifying this case.

While living in Suffolk County from 2004-2011, the enterprise had school buses pull in front of plaintiff no matter where Plaintiff was, in order to make it appear that Plaintiff was following school buses.[10]

Plaintiff in NY crossed the river.[11]

33. The representative examples which follow are not isolated instances. Rarely a day has passed since the early 2000's that firemen and confederates have not engaged in stalking, the use of lights and sirens without an underlying incident, or related criminal conduct.

Representative Incidents

34. In or about 2001, Plaintiff lost phone service at his home for the second time in that year. It took approximately five days for Bell Atlantic to restore service.

35. That was because Bell Atlantic could not locate where the disruption in service was. Eventually, Plaintiff was notified that the reason he kept losing phone service was that his phone line had been cut twice – once in the basement of his building on the Upper West Side, the second time from inside a Bell Atlantic facility on W. 72nd Street.[12]

36. March 3, 2003 – the first indication of NYPD involvement.

37. Plaintiff was representing an individual at 347 Broadway (NYC Summons Court). It had snowed heavily, and Plaintiff could, by this time, no longer travel safely by subway.

38. As Plaintiff stood in a relatively empty hallway, he noticed a heavy white male facing the Broadway entrance where two Court Officers were stationed in a vestibule. The heavy male stood

---

[11] One of these individuals appeared to be associated with an FDNY ambulance unit, the other was a member of the Irish mob who drove a Livery cab. (See Paragraph 45).

[12] On one occasion, two individuals were seen running from Plaintiff's building; they got into a vehicle parked on W.87th Street and covered their faces. They were later seen working on a Bell Atlantic upgrade in Plaintiff's building. Plaintiff believes he knows the identity of one of the two individuals.

just inside the interior doorway and kept opening and closing his hand.  He would open his hand whenever anyone walked up to the entrance such that the Court Officers in the vestibule were thus preoccupied and therefore, would not look behind them down the interior hallway.  Plaintiff turned around and noticed numerous gang members observing.  Plaintiff went into a courtroom and brought a uniformed officer into the hallway to observe.  He took the heavy white male into a side room.  He came out a minute or two later and said "There's no need to worry – he's a police officer." The uniformed officer had no way of knowing that there was a definite reason to worry: for the first time in the growing avalanche of thuggery, it was now apparent that members of the NYPD were involved.

39. As soon as the uniformed officer returned to the courtroom, the plainclothes officer walked out of the courthouse to the North West corner of Broadway.  There he met then FDNY Commissioner Cassano.  Then he turned around and began to walk back to the Courthouse.  As a pretext, Plaintiff apologized to the officer and asked his name – to which he replied "Fenford." He spelled it that way when asked to spell it.  In fact, it was officer Timothy Fenfert, who wasn't just an officer, but rather a Vice officer, who would later be implicated in an NYPD conspiracy to frame adult Gay men as prostitutes – offering them money as they perused an adult bookstore in Manhattan, and then falsely claiming that they assented.  Fifty year old Gay men accused of prostitution for patronizing an adult bookstore.  Fenfert was also properly identified because he was a contestant on a game show hosted by Meredith Veira, and identified himself as an NYPD Vice Officer.

February, 2011

40. In or about February of 2011, Plaintiff was en route

to park his vehicle at a friend's home in N. Newark and then board a private bus back to NY to appear in Court the following morning.[13]

41. Several blocks from Plaintiff's destination, a large SUV in front of Plaintiff's vehicle, blocked Plaintiff and did not move at a green light. The vehicle replicated this behavior at the next light where Plaintiff intended to turn right.

42. Plaintiff then made a right turn and the SUV – which had been ahead of Plaintiff, rapidly turned and came up along side Plaintiff with flashing lights and sirens.

43. Two African American males were in the front seat and a white male who Plaintiff recognized from an incident in Manhattan was in the back seat. The white male asked: "Where are you headed?" to which Plaintiff responded "Why am I being pulled over?"

44. The white male in the back seat stated "You didn't do anything wrong. We're just stopping you to say 'hello.'"

45. Plaintiff responded by stating: "ID Officers."

46. The white male in the back seat stated: "What makes you think I'm an officer? How do you know I'm not a limo driver?"[14] The vehicle then sped off.

47. The license plate came back as a "no hit." Years later, through service of a subpoena, it was revealed that the plate was associated with the Essex County (NJ) Sheriff's Department.

December 31, 2012

48. Throughout 2012, two members of the NYPD, one male named Ortiz, and a female officer (white shirt), regularly followed

---

[13] Plaintiff's vehicle could not be parked in NYC overnight without having its tires slashed or otherwise vandalized.

[14] This remark was a complete non-sequitor in the context of events which had just unfolded. It was meant to communicate to Plaintiff the speaker's involvement with events in Manhattan in which Plaintiff had discovered that livery cab vehicles were running numbers for a local bookmaker.

Plaintiff to a location at or about W. 36th Street and Broadway where Plaintiff would meet his (then) boyfriend on Friday evenings.

49. When Plaintiff began documenting the two officers' repeated actions, the female officer used her visor to attempt to block plaintiff from recording her misconduct. She is referred to as Jane Doe 1 here.

50. On or about December 31st 2012, plaintiff and plaintiff's then boyfriend met with friends at a restaurant in Manhattan.

51. Defendants had orchestrated a scheme in which, at dinner, Plaintiff's then boyfriend was approached by another male asking for plaintiff's boyfriend's phone number and ostensibly flirting with Plaintiff's then boyfriend.[15]

52. This activity was repeated and instrusive and had the intended effect of causing discord between plaintiff and plaintiff's then boyfriend. After excusing themselves to discuss the matter privately in another area of the restaurant, Plaintiff's then boyfriend suggested that they leave the restaurant and go back to the boyfriend's apartment.

53. Plaintiff and his then boyfriend left the restaurant to hail a cab for that purpose.

54. However, upon exiting the restaurant, plaintiff immediately noticed two NYPD vehicles parked in front of the restaurant.

55. Upon information and belief, one of the officers seated in one of the vehicles was Officer Jane Doe.

56. Plaintiff and his partner walked a little further up the street, and located a vacant taxi which was stuck in traffic.

---

[15] It was not the first time that defendants had engaged in such a strategy.

While the cab was still idling, ROBERT PEREZ drove up behind the cab. PEREZ was the individual who stalked plaintiff incessantly in Suffolk County from 2004 – 2012.[16]

2015 Assault

57. In or about late December, 2015, Plaintiff went to 37th St. and 10th Avenue in order to catch a bus to Columbus Circle to attend a friend (and client's) holiday party.[17]

58. Standing near the bus stop was a member of the FDNY (in uniform).

59. Also present were several males not actually standing at the stop. An unmarked police vehicle with NY plates was idling at the bus stop as well.[18] At one point, the uniformed fireman shook hands with the driver of the undercover vehicle (who was not in uniform).[19]

60. Eventually, an FDNY ladder truck appeared and the uniformed member of the FDNY got onto the truck and left.

61. Not long thereafter, an individual who was leaning against the façade of a building shoved plaintiff, at which point the ringleader – a mixed race male approximately 6'2" – 6'4" summoned all of the confederates and they ran off. The individual who assaulted Plaintiff had previously been seen acting as lookout for a person who

---

[16] A subpoena to Robert Perez will help identity the other principals of the enterprise.

[17] It would ordinarily be impossible for Plaintiff to travel by any means of public transportation, but inasmuch as the trip was only 20 blocks, Plaintiff believed it possible.

[18] That vehicle was a "no hit" from NYS DMV. A subpoena to the NYPD and federal agencies for the ownership attached to this plate will be of aid in furthering this case.

[19] This incident demonstrates that the gang involvement is happening with NYPD/FDNY involvement and protection.

was in the process of slashing plaintiff's tires in front of a homeless shelter on W. 36th Street where plaintiff was counsel.

June 23, 2016

62.  On June 23, 2016, Plaintiff was representing an individual in Kings County Landlord-Tenant Court.

63.  At 1:35 p.m., as Plaintiff was leaving 141 Livingston Street in Brooklyn, Ladder 110 pulled up and entered the Courthouse.

64.  Later, at approximately 1:50 p.m., Plaintiff took a cab back to Manhattan from Livingston Street.  FDNY ambulance 919 was scouting with lights flashing, but no sirens; when it observed Plaintiff get into the cab, it continued on.  Suddenly, Plaintiff's cab was overtaken by FDNY ambulance 577 with lights and sirens.  (Ex. _).

65.  On July 10, 2016, Plaintiff suffered a heart attack.

October 4, 2016

66.  On October 4, 2016, at 1:54 pm, Plaintiff was leaving a cardiologist's office at or about E. 61st St. in Manhattan.  As Plaintiff exited the building, Ambulance 1768 and FDNY Truck 8 were waiting at the exit of the building.

December 6, 2021

67.  Of the hundreds of stalking incidents which evidence defendant's(s') surveillance and tracking of plaintiff's location, one particularly representative exemplar occurred on December 6, 2021.  Plaintiff had agreed to meet an individual at a corner in Manhattan for coffee.

68.  At approximately 12:35 pm, minutes after Plaintiff

exited the Uber/Lyft, FDNY ambulance 185, using lights and sirens, pulled up directly to where Plaintiff was standing (Northeast corner of 6th Ave. and 54th Street); several minutes later, it moved to the opposite side of the street. [Ex.  ]

69. According to the FDNY's FOIL unit, there was no record of this call and no 911 call.

May 7, 2024

70. On May 7, 2024, plaintiff took a Lyft to Manhattan. When the vehicle in which Plaintiff was traveling emerged from the tunnel at approximately 2:41 p.m., it was surrounded by FDNY ambulances 1258 and 2201 using lights and sirens. [Ex.  ]

71. According to the FDNY FOIL unit, there is no record of this call.

72. Several undercover vehicles were also proximate to the Location where Plaintiff was headed on May 7th, 2024; upon information and belief, one of these vehicles was the same as that idling at the bus stop in December of 2015 during which Plaintiff was assaulted.

August 28, 2024

73. On or about August 28, 2024, Plaintiff travelled to Manhattan for a meeting with an attorney on 9th Avenue.

74. After the meeting, Plaintiff was waiting for a LYFT when he noticed a large, mixed-race male without apparent purpose, surveilling Plaintiff. Upon information and belief, this individual was the ringleader during the December, 2015 assault.

September 19, 2024

75. On September 19, 2024, Plaintiff had two back-to-back closings in Manhattan. Both were scheduled by phone and email between

the undersigned and the buyer's and seller's attorneys respectively.

76. Not long after arriving on E. 40th Street for the first closing, an announcement came over the building's P.A. system that a fire drill was going to be conducted. Plaintiff recorded this announcement.

77. Plaintiff arrived in Flatiron for the second closing at approximately 1:30 pm. Shortly after arriving, an announcement was made over the building's P.A. system that a fire drill was being conducted or that a fire alarm had been lodged. Plaintiff recorded this announcement.

78. This is classic FDNY behavior which often occurs in the middle of judicial proceedings. In this instance, it was simply intended to demonstrate that the enterprise knows Plaintiff's every move.

The June 1/June 19 Incidents

79. Such an incident occurred on June 1st and June 19th, 2025 in Bloomfield, NJ. Plaintiff was driven by a friend to a community garden approximately 2 miles when the vehicle was met by a large, white SUV with an FMBA shield in the driver's front windshield. There was no front plate. Plaintiff documented the vehicle's plate after the driver of the vehicle in which Plaintiff was riding allowed the SUV to pass. It had reflective film over the back license plate – the type that is used to interfere with the ability of ALPR's to read license plates.

80. The vehicle continued ahead of Plaintiff and veered off just before the turn to the community garden. Approximately 30-40 minutes later, the vehicle appeared at the community garden. Plaintiff documented this.

81. On June 19th, 2025, Plaintiff was working in the front yard

when he heard a vehicle rapidly pull away from the curb across the street and speed off. It was the same vehicle.

82. Defendants are "State actors" as that term is defined in 42 U.S.C. Section 1983 and decisional law thereunder.

83. To the extent that any of the Doe defendants is not a State actor, the complained of conduct is actionable pursuant to 42 U.S.C. Section 1985(3).

84. In retaliation for Plaintiff's role in representing the Plaintiffs in <u>Cavallo/Stapen v. Finn</u>, Defendants and each of them have subjected Plaintiff to continuous surveillance, tracking plaintiff's movement and showing up at contrived/pretextual "emergencies" for more than two decades.

85. As such, Defendants have engaged in a decades-long search in contravention of the 4th Amendment to the Constitution of the United States.

<u>COUNT I: VIOLATION OF 42 U.S.C. Section 1983</u>

86. Paragraphs 1 – 85 are repeated and realleged as though fully set forth and incorporated by reference herein.

87. Defendants' conduct of subjecting plaintiff to surveillance and stalking, false alarms, and the pretextual use of lights and sirens over the course of at least two and a half decades, constitutes a violation of the Fourth Amendment to the Constitution of the United States under *United States v. Jones*, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012) and *Carpenter v. United States*, 138 S.Ct. 2206, 201 L.Ed.2d 507 (2018).[20]

88. Except perhaps for defined units devoted to the

---

[20] In those cases, the Supreme Court held that a 4th Amendment search had taken place after the police subjected a defendant to surveillance for weeks.

investigation of arson or fire-related crimes, the FDNY has no authority to subject anyone to surveillance, much less protracted surveillance or to (mis)use its equipment by engaging in non-existent "emergencies," or take take part in pretextual emergencies, or to engage in any of the other criminal conduct alleged.

89. Accordingly, the complained of conduct is violative of 42 U.S.C. Section 1983.

90. As a direct and proximate result of defendants' actions, and each of them, plaintiff has been caused to suffer injury and is entitled to compensatory and punitive damages therefor.

### COUNT II: VIOLATION OF 42 U.S.C. Section 1985(3)

91. Paragraphs 1 – 90 are repeated and realleged as though fully set forth and incorporated by reference herein.

92. To the extent that any Doe defendant is or was not a member of the FDNY or NYPD (or other municipal agency), such defendant has acted in concert with State actors or other individuals in subjecting plaintiff to protracted surveillance, thereby depriving plaintiff of rights secured by the Fourth Amendment to the Constitution of the United States.

93. Such conduct is therefore violative of 42 U.S.C. Section 1985(3).

94. As a direct and proximate result of defendants' actions, and each of them, plaintiff has been caused to suffer injury and is entitled to compensatory and punitive damages therefor.

### COUNT III: VIOLATION OF 42 U.S.C. Section 1983

95. Paragraphs 1 – 94 are repeated and realleged as though fully set forth and incorporated by reference herein.

96.     Defendants' conduct of subjecting plaintiff to surveillance and stalking, false alarms, and the pretextual use of lights and sirens over the course of at least two and a half decades, constitutes a violation of the First Amendment to the Constitution of the United States under <u>Perkins Coie LLP v. United States Department of Justice</u>, ____ F. Supp. ____ 2025WL1276857 (DDC 2025; Beryl A. Howell, USDC) in that the complained of conduct is in retaliation for activity protected by the First Amendment to the Constitution of the United States, to-wit: the representation of People With AIDS against a member of the FDNY.

97. Accordingly, the complained of conduct is violative of
   42 U.S.C. Section 1983.

98.     As a direct and proximate result of defendants' actions, and each of them, plaintiff has been caused to suffer injury and is entitled to compensatory and punitive damages therefor.

COUNT IV: VIOLATION OF 42 U.S.C. Section 1985(3)

99.     Paragraphs 1 – 98 are repeated and realleged as though fully set forth and incorporated by reference herein.

100.    Defendants' conduct of subjecting plaintiff to surveillance and stalking, false alarms, and the pretextual use of lights and sirens over the course of at least two and a half decades, constitutes a violation of the First Amendment to the Constitution of the United States under <u>Perkins Coie LLP v. United States Department of Justice</u>, ____ F. Supp. ____ 2025WL1276857 (DDC 2025; Beryl A. Howell, USDC) in that the complained of conduct is in retaliation for activity protected by the First Amendment to the Constitution of the United States.

101.    To the extent that any Doe defendant is or was not a member of the FDNY or NYPD (or other municipal agency), such defendant

has acted in concert with State actors or other individuals in subjecting plaintiff to protracted surveillance, thereby depriving plaintiff of rights secured by the Fourth Amendment to the Constitution of the United States.

102.   Such conduct is therefore violative of 42 U.S.C. Section 1985(3).

103. As a direct and proximate result of defendants' actions, and each of them, plaintiff has been caused to suffer injury and is entitled to compensatory and punitive damages therefor.

WHEREFORE, Plaintiff demands judgment against defendants, jointly and severally, together with declaratory and injunctive relief, compensatory and punitive damages, costs, attorney's fees, and such other and further relief as to the Court may appear just and proper.
Dated: August 8, 2025

/s Theodore Bohn
Theodore Bohn, MSW

### JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.